# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ACOUSTICAL SURFACES, INC., a Minnesota corporation, | ) ) ) CASE NO.: 13-CV-4837 |
| Plaintiff, | ) ) Judge Robert M. Dow, Jr. |
| v. | ) ) |
| VERTETEK CORPORATION, ET AL., | ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on two motions: (1) a motion for a more definite statement and to dismiss filed by Defendants Vertetek Corporation, Richard Pulciani, Timm Rucinski, and Antonio Belmonte (collectively "Vertetek Defendants") [27]; and (2) a motion to dismiss filed by Defendants 360 Coatings, LLC and David Rairick ("360 Defendants") [29]. For the reasons set forth below, the Court grants in part and denies in part the Vertetek Defendants' motion to dismiss [27] and grants in part and denies in part the 360 Defendants' motion to dismiss [29]. The Court denies the Vertetek Defendants' motion for a more definite statement [27]. Counts 6 and 7 are dismissed as to Defendants Richard Pulciani, Timm Rucinski, and Antonio Belmonte, and Count 5 is dismissed as to Defendant David Rairick. All other claims survive Defendants' motions to dismiss.

**I.** **Background**[1]

Plaintiff is a Minnesota corporation, located in Minnesota, which markets and sells acoustical and architectural products in the United States. Defendant Vertetek is an Illinois

---

[1] For purposes of Defendant's motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaints. See, e.g., *Killingsworth v. HSBC Bank Nevada*, *N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Unless otherwise specified, all citations in this section correspond to Plaintiff's complaint [1].

1

corporation located in Illinois, which makes a paint product called "Coat of Silence," an acoustical, sound-reduction paint applied to interior and exterior surfaces. Individual Defendants Pulciani, Rucinski, and Belmonte are Illinois or Indiana residents, and officers or agents of Vertetek. Defendant 360 Coatings, LLC is a Wyoming limited liability company located in Florida, and Rairick, a North Carolina resident, is 360's sole member and president. 360 distributes Vertetek's paint products throughout the U.S.

### A. The February 2012 Agreement between Vertetek and Acoustical

On February 20, 2012, Acoustical and Vertetek entered into an exclusive distribution agreement. Prior to this agreement, Vertetek had not effectively marketed or sold its Coat of Silence product, either by itself or through a distributor, and thus had little or no market recognition or customer demand for that product. Under the agreement, Acoustical was to be Vertetek's exclusive distributor of "Manufacturer's Products" in North America, Eastern Europe, and the Middle East. "Manufacturer's Products" meant Vertetek's "complete range of products manufactured and sold by [Vertetek] for interior and exterior applications for acoustical and vibration control purposes * * *." The agreement was for an initial term of five years, unless terminated earlier in accordance with the agreement. The final signed agreement provided that Acoustical would purchase a minimum of $500,000 of product in the first two years, and a minimum of $400,000 in each of the third through fifth years. The agreement prices were $46.00 per gallon for base paint, and $56.00 per gallon for enhanced paint (with a class A fire-retardant additive).

The agreement contained a number of marketing, purchase, and resale requirements for Acoustical, as well as certain termination provisions. If Acoustical failed to meet its annual purchase quotas under section 8 of the agreement, Vertetek had the option to terminate the

agreement upon advance written notice. Acoustical could cure the shortfall within 30 days after receiving the notice. The agreement also was terminable by either party "in the event of a significant and material breach," or "serious misconduct * * * clearly detrimental to its best interests" by the other party. Such termination required 30 days written notice with an opportunity to cure.

### B. The April 2012 Agreement between Vertetek and 360

On April 10, 2012, Vertetek and 360 entered into the Private Label and Supply Agreement. This agreement granted rights to 360, for an initial term of three years, to purchase, market, and resell "Vertetek Products" in the United States under 360's "Private Labels." "Vertetek Products" meant "Vertetek's complete range of paint and coating products * * * including all products traded under Coat of Silence Coatings * * * for interior and exterior applications for acoustical and vibration control purposes * * *." 360 agreed not to promote or sell those products under any other name other than its Private Labels. The agreement required 360 to purchase a minimum of $1 million of product each year. The agreement price was $56.00 per gallon.

Plaintiff alleges in the complaint that this agreement "required the parties to keep and maintain all aspects of their contractual relationship confidential"; however, the agreement itself, which is attached to the complaint, defined the restricted "Confidential Information" only as the parties' non-public business information and carved out of the "Confidential Information" definition any information in the public domain or already known to the recipient, independent of disclosure by the other party.

According to Plaintiff, the agreement established 360 "as a direct competitor of Acoustical" because it allowed 360 to sell "identical Vertetek Products under a different brand

3

name throughout Acoustical's core market." Plaintiff alleged "upon information and belief" that 360 knew or should have known that Acoustical was Vertetek's exclusive distributor, but 360 nevertheless signed the April 2012 agreement "without regard for Acoustical's existing distribution rights." Plaintiff did not allege any specific fact or circumstance regarding 360's or Rairick's awareness, prior to signing the April 2012 agreement, that Acoustical was Vertetek's exclusive distributor. Nor does Acoustical allege anywhere in its complaint that 360 or Rairick ever knew there was a signed written agreement between Acoustical and Vertetek, or that 360 or Rairick ever saw that agreement.

### C. Post-Agreement Dealings Between the Parties

On April 25, 2012, Acoustical learned, and Vertetek confirmed, that 360 was selling Coat of Silence under the "Serenity Paint" private label. Acoustical told Vertetek that its agreement with 360 was a "in direct contravention of the Acoustical Agreement" and that any sales to 360 amounted to a breach of their agreement. Several subsequent conference calls between Acoustical and Vertetek did not resolve the issue. On May 15, 2012, Vertetek sent to Acoustical a proposed memorandum of understanding, under which Acoustical would agree that the 360-Vertetek agreement would not breach the Acoustical agreement. Acoustical refused, and demanded a copy of the 360-Vertetek agreement. Vertetek refused, citing confidentiality. But on June 4th, when Vertetek invited Acoustical and 360 to Chicago to talk about their situation, Vertetek sent to Acoustical a copy of the signed agreement with 360.

As a result of the ensuing June 13th meeting in Chicago, the parties "agreed" that (i) 360 was required to purchase Vertetek products from Acoustical, (ii) 360 could not sell the products to subdistributors or resellers, but only to end users, (iii) 360's labels would contain a "Coat of Silence" tag line, (iv) Acoustical and 360 would negotiate a private-label supply agreement,

which when finalized would be sent to Vertetek for approval, and (v) Vertetek would provide a discount on products sold to Acoustical for resale to 360. The complaint does not allege any written memorialization of this agreement. However, after the meeting, Acoustical and Vertetek negotiated discounts for product purchased for 360, Acoustical sent a draft agreement to 360, and Acoustical's marketing staff discussed product labeling with 360. (Id., ¶¶ 28-29). 360 suggested changes to the agreement in July 2012, and Acoustical agreed to revise its prior draft and "provided the revised proposed agreement to [360]."[2]

Over the next several months, despite Acoustical's attempts to further negotiate its agreement with 360, Rairick would not respond. 360 continued to sell product under the Serenity Paint label, even though it had not purchased any product from Acoustical. Acoustical notified Vertetek that 360 refused to respond to Acoustical's proposed agreement. In response to Acoustical's repeated requests to have 360 respond, Vertetek admitted that 360 contacted Vertetek to place orders, but that Vertetek told 360 that it had to buy from Acoustical. Eventually, Mr. Pulciani agreed to contact 360 and to request that 360 respond to the proposed agreement provided by Acoustical. On December 3, 2012, Pulciani informed Anderson that he spoke to Rairick and that 360 planned to respond to Acoustical's proposed agreement "by the first of the year." In January and February 2013, despite Acoustical's continued attempts, 360 did not respond.

Also in January 2013, Acoustical and Vertetek reviewed and discussed their contract prices. In a January 25 e-mail, Vertetek said that it wanted to keep its business with 360 separate from Acoustical because Vertetek was dealing with 360 prior to Acoustical. In a February 8 e-mail, 360 proposed that it be permitted to sell to a broad range of subdistributors and re-sellers,

---

[2] 360's assertion in its memorandum—that "Acoustical did not allege that it ever subsequently sent a further revised draft to 360"—contradicts the allegations in the complaint.

5

in competition with Acoustical. Acoustical refused the proposal.

On February 20, Acoustical received a promotional e-mail from 360, stating that 360 had just successfully marketed its Serenity Paint product on a TV show. That same day, Vertetek told Acoustical that Vertetek had been in contact with 360 and that it intended to intervene in Acoustical's efforts to secure an agreement with TSC. Vertetek's representatives stated that Mr. Pulciani had directed them to take the lead in assisting Acoustical in securing a written agreement for TSC's proposed private label distribution of COS Products. They acknowledged that they had already been in contact with TSC and its President, and that they were familiar with the proposed agreements previously exchanged between Acoustical and TSC. They expressly stated that they would ensure that TSC promptly signed a private label distribution agreement with Acoustical and stated that if TSC refused to do so, they would force TSC to cease actively promoting Vertetek Products. Acoustical permitted Vertetek to broker that agreement, and Vertetek "assured" Acoustical that it would tell 360 that Acoustical's terms were the final, non-negotiable terms under which 360 could sell Vertetek's products.

On March 13, Vertetek came to Acoustical's Minnesota office to discuss the proposed agreement. Vertetek requested adding various provisions, including one terminating Vertetek's existing agreement with 360. Vertetek said that upon execution, Vertetek would re-offer to Acoustical the pricing discounts discussed at the June 2012 meeting. On March 18, Acoustical sent to Vertetek a revised draft agreement between Acoustical and 360, and the next day, Vertetek confirmed that it had sent the draft to 360.

On April 1, 2013, the same day that Acoustical ordered more product and samples from Vertetek, Vertetek's lawyer sent to Acoustical a notice of termination of their agreement. The termination notice, without elaboration, said that Acoustical materially and significantly
6

breached the agreement, and gave 30 days to cure. After delivering the notice, Vertetek refused to sell its products to Acoustical. Between April 2 and 17 (during Acoustical's cure period), Acoustical verified the following: (i) TSC was selling and delivering Vertetek Products under the label, "Serenity A Coat of Silence"; (ii) TSC's website "www.serenitycoatings.com" listed several representatives for its Serenity Paint and actively solicited inquiries by anyone interested in becoming a sales representatives for Serenity Paint; and (iii) on April 17, 2013, Bryant Mayo called Acoustical's offices and offered Acoustical the opportunity to be an authorized sales representative for Serenity Paints. Mr. Mayo is not listed as an authorized agent or representative for Serenity Paint on their website. On request, Mr. Mayo provided Mr. Anderson with a copy of Serenity Paint's pricing policies.

On April 17, Acoustical's lawyer sent to Vertetek a demand letter, copy to 360, insisting that Vertetek (i) honor its agreement with Acoustical and ship product to Acoustical, (ii) describe how Acoustical could cure its alleged breaches, (iii) account for Vertetek's Coat of Silence sales to Acoustical, 360, and any other customers in Acoustical's territories, (iv) surrender to Acoustical all active sales leads, and (v) cease shipping product to 360 and any other customer in Acoustical's territories. On April 25, Vertetek responded in writing, refusing those demands.

## II. Legal Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint, not the merits of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in its favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief"

7

(Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

Where a complaint sounds in fraud, the allegations of fraud must satisfy the heightened pleading requirements of Rule 9(b). Fed. R. Civ. P. 9(b); see also *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 507 (7th Cir. 2007) (citing *Rombach v. Chang,* 355 F.3d 164, 170–71 (2d Cir. 2004)). Rule 9(b) states that for "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). A complaint satisfies Rule 9(b) when it alleges "the who, what, when, where, and how: the first paragraph of a newspaper story." *Borsellino,* 477 F.3d at 507 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990)). Rule 9(b), read in conjunction with Rule 8, requires that the plaintiff plead "the time, place and contents" of the purported fraud. *Fujisawa Pharm. Co., Ltd.*

*v. Kapoor,* 814 F. Supp. 720 (N.D. Ill. 1993). "The purpose of this heightened pleading requirement is to 'force the plaintiff to do more than the usual investigation before filing his complaint.'" *Amakua Dev. LLC v. H. Ty Warner,* 411 F. Supp. 2d 941, 953 (N.D. Ill. 2006) (citations and internal quotation marks omitted).

**III.    Analysis**

Acoustical's complaint alleges seven causes of action: breach of contract against Vertetek (Count I); quantum meruit against Vertetek (Count II); promissory estoppel against Vertetek (Count III); fraudulent inducement/misrepresentation against Vertetek, Richard Pulciani, Timm Rucinski, and Antonio Belmonte (Count IV); tortious interference with contract against 360 and David Rairick (Count V); tortious interference with contract against Vertetek, Richard Pulciani, Timm Rucinski, and Antonio Belmonte (Count VI); and tortious interference with prospective economic advantage against Vertetek, Richard Pulciani, Timm Rucinski, and Antonio Belmonte (Count VII).[3] The Vertetek Defendants move for a more definite statement as to Count I and an order dismissing the remaining counts asserted against them. The 360 Defendants move to dismiss Count V.

    **A.    The Vertetek Defendants' Motion for a More Definite Statement**

The Vertetek Defendants move for a "more definite statement" of the allegations in Count 1. A defendant can move for a more definite statement under Federal Rule of Civil Procedure 12(e) where a "pleading fails to specify the allegations in a manner that provides sufficient notice." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513 (2002). Motions under Rule 12(e) are generally disfavored and courts should grant such motions only if complaint is so unintelligible that the defendant cannot draft responsive pleading. *555 M Mfg., Inc. v. Calvin*

---

[3] The lawsuit is before this Court under its diversity jurisdiction, 28 U.S.C. § 1332.

*Klein, Inc.,* 13 F.Supp.2d 719, 724 (N.D. Ill. 1998); *Moore v. Fidelity Financial Services, Inc.,* 869 F.Supp. 557, 559–560 (N.D. Ill. 1994).

The present lawsuit arises out of a written exclusive distribution agreement entered into between Acoustical and Vertetek on February 20, 2012, whereby Vertetek granted Acoustical the exclusive distribution rights for a paint line with sound resistant qualities. This agreement is attached to the complaint as Exhibit A and referred to as the "Acoustical Agreement" throughout the Complaint. Vertetek's allegations of confusion require intentional avoidance of the attached agreement and explicit language in Count I. As set forth in detail in the fact section above, the complaint in this case is far from "unintelligible"; it provides a detailed yet concise statement of Plaintiff's breach of contract claim against Vertetek. At this stage, no more is required.

### B.  Quantum Meruit and Promissory Estoppel Against Vertetek

Acoustical asserts claims for quantum meruit and promissory estoppel against Vertetek in Counts II and III of the complaint. Vertetek asserts that these claims are barred because, under Illinois law, "a plaintiff may not pursue quasi-contractual or tort claims if its relationship with the defendant is governed by an express contract." In response, Acoustical points out that the federal pleading standards allow for pleading in the alternative, which permits a party to make claims that may not be facially consistent. See *Cromeens, Holloman, Sibert, Inc. V. AB Volvo,* 349 F.3d 376, 397 (7th Cir. 2003). The Seventh Circuit has explicitly stated that a "party is allowed to plead breach of contract, or if the court finds no contract was formed, to plead for quasi-contractual relief in the alternative. Once a valid contract is found to exist, quasi-contractual relief is no longer available." *Id.* Acoustical contends that it has pled alternative theories of relief by including its quantum meruit and promissory estoppel claims along with a claim for breach of contract. Here, while it appears that there is a contract between the parties, the terms of the contract have yet to be established. Moreover, there are

allegations pertaining to signed contracts, draft contracts, and agreements to terminate the original Acoustical contract. Until discovery is conducted to determine the breadth and length of the contractual relationship, Plaintiff's allegations control. Although Acoustical will not be able to recover under its quasi-contract claims if there was in fact a contract governing its relationship with Vertetek, it may proceed with such alternative theories at this stage.

### C. Fraudulent Inducement/Misrepresentation Against Vertetek Defendants

Under Illinois law, fraudulent inducement requires proof of five elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. See *Hoseman v. Weinschneider*, 322 F.3d 468 (7th Cir. 2003). Similarly, in order to prevail on a claim of fraudulent misrepresentation, a plaintiff must establish the following elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance. See *Doe v. Dilling*, 888 N.E.2d 24 (Ill. 2008). Under Illinois law, all those who participate in a fraudulent act are guilty of fraud, including officers and agents of an organization. See *id.* at 615-16.

As previously set forth, allegations of fraud are subject to Rule 9(b)'s heightened pleading standard. The Vertetek Defendants claim Plaintiff has failed to satisfy this standard because, "Acoustical alleges that Vertetek and its agents made certain representations to Acoustical, but it is unknown when such alleged representations were made." The complaint sets forth numerous statements made by Vertetek and the individuals involved in the allegedly fraudulent scheme. The paragraphs contain the exact or approximate date of the

11

misrepresentation. These allegations, which are specific to each individual and have a temporal component, meet the standard set forth in Rule 9(b).

However, Plaintiff's fraud allegations may suffer from a different defect. In essence, Plaintiff is pursuing a theory of "promissory fraud." Acoustical alleges that the Vertetek Defendants committed fraud when they promised to do certain things in the Acoustial-Vertetek agreement, knew at the time that the promise was untrue, and then failed to perform its obligations. Illinois generally does not recognize promissory fraud claims. See, *e.g., General Elec. Credit*, 532 N.E.2d 361, 364 (Ill. App. Ct. 1988) ("As a general rule, promissory fraud, based on future acts, is not actionable in Illinois."); see also *Bradley Real Estate Trust v. Dolan Associates Ltd.*, 640 N.E.2d 9, 12-13 (Ill. App. Ct. 1994) (explaining that under Illinois law, "a statement of future intention cannot generally be the basis of a claim of fraud because alleged misrepresentations must be statements of present or preexisting facts, and not statements of future intent or conduct"). It also is true, however, that Illinois recognizes an exception to this general rule: such claims are permitted where "the fraud is one element of a pattern of fraudulent acts, and the scheme is intended to induce the promisee to act for the promisor's benefit at the time of the promise." *Harrison Wells Partners, LLC v. Chieftain Const. Holdings, Ltd.*, 2009 WL 3010847, *4 (N.D. Ill. Sept. 16, 2009) (citation and quotation marks omitted). Courts and commentators alike have remarked upon the difficulty of determining when Illinois' so-called "scheme-to-defraud" exception applies. See, *e.g., Desnick v. American Broadcasting Companies, Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995) ("The distinction between a mere promissory fraud and a scheme of promissory fraud is elusive, and has caused, to say the least, considerable uncertainty, as even the Illinois cases acknowledge."); *Chicago Messenger Service, Inc. v. Nextel Communications, Inc.*, 2003 WL 22225619, at *7 (N.D. Ill. Sept. 24, 2003)

("Commentators have noted that this "scheme to defraud" exception has not been elucidated, and has resulted in confusion and inconsistent application among Illinois courts."). Nevertheless, the Seventh Circuit has offered the following gloss: "Our best interpretation is that promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." *Desnick*, 44 F.3d at 1354; see also *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co., Ltd.*, 707 F.3d 853, 865 (7th Cir. 2013) (noting that in order to establish a scheme to defraud, Plaintiff must demonstrate that "the [alleged] misrepresentation is embedded in a larger pattern of deception or the deceit is particularly egregious"); but see *Shirley v. Jed Capital, LLC*, 2010 WL 2721855, *8 (N.D. Ill. July 8, 2010) (quoting *Concord Indus., Inc. v. Harvel Indus. Corp.*, 462 N.E.2d 1252, 1255 (Ill.App.Ct. 1984) ("Where a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where that other party relies upon it to his detriment, the false promise will be considered an intended scheme to defraud the victim and will be actionable.")).

At the motion to dismiss stage, the Court accepts as true a plaintiff's allegations. Here, the Court concludes that Acoustical has alleged a pattern of deception. To be sure, any alleged misrepresentations pertaining to the original agreement between Acoustical and Vertetek likely fail to state a claim for fraud. But the allegations pertaining to the triangle between 360, Vertetek, and Acoustical are more complex. While the alleged pattern of deception involving all three entities stills looks a lot like a contract gone bad (in other words, like a straightforward breach of contract claim), discovery will flesh out who knew what at what time. For now, Acoustical's detailed allegations state a claim.

### D. Tortious Interference Against Vertetek Defendants

Tortious interference with contract and tortious interference with business expectancy are related torts that recognize that one's business relationships constitute a property interest and are entitled to protection from unjustified tampering by another.[4] *Belden Corp. v. InterNorth, Inc.,* 413 N.E.2d 98, 101 (Ill. App. Ct. 1980) (citing *City of Rock Falls v. Chicago Title & Trust Co.,* 300 N.E.2d 331, 333 (Ill. App. Ct.1973)). "Both causes of action imply a balancing of societal values: an individual has a general duty not to interfere in the business affairs of another, but he may be privileged to interfere, depending on his purpose and methods, when the interference takes a socially sanctioned form[.]" *Id.* The elements of a claim for tortious interference with an existing contractual relationship are "(1) the existence of a valid enforceable contract between the plaintiff and another; (2) the defendant's awareness of the relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract which causes a subsequent breach by the other, and (4) damages." *Premier Transport, Ltd. v. Nextel Communications, Inc.*, 2002 WL 31507167, * 1 (N.D. Ill. Nov. 12, 2002); see also *Botvinick v. Rush Univ. Med. Ctr.,* 574 F.3d 414, 417 (7th Cir. 2009) (quoting *Fellhauer v. City of Geneva,* 568 N.E.2d 870, 878 (Ill. 1991)). The elements for interference with a business expectancy are "(1) a reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Id.*

---

[4] The tort also is commonly referred to as interference with prospective economic advantage or prospective contractual relations. See *Delloma v. Consolidation Coal Co.,* 966 F.2d 168, 170–71 (7th Cir. 1993).

Whether Plaintiff has a tortious interference with contract or tortious interference with business expectancy claim will be determined after the parties conduct discovery into whether a valid contract existed. For now, these claims can proceed in the alternative. Acoustical alleges that the Vertetek Defendants claimed to be assisting Acoustical in negotiating an agreement with 360, whereby 360 was required to purchase Vertetek products from Acoustical exclusively, while simultaneously selling Vertetek Products to 360. In other words, Acoustical alleges that Vertetek represented that it would broker an agreement between Acoustical and 360 that was satisfactory to both sides, but in fact Vertetek was sabotaging the relationship. These allegations state a classic claim for interference with a contract or business expectancy against Vertetek.

The issue that remains is whether Acoustical has stated a claim against the individual Defendants. Corporate officers normally enjoy protection from personal liability for acts they commit on behalf of the corporation. See *George A. Fuller Co. v. Chicago College of Osteopathic Medicine,* 719 F.2d 1326, 1333 (7th Cir. 1983) (discussing Illinois law). To get around this qualified privilege in a tortious interference claim in Illinois, a plaintiff must "establish that the officers induced the breach to further their personal goals or to injure the other party to the contract, *and* acted contrary to the best interest of the corporation." *Id.* at 1333 (citations omitted); see also *Von der Ruhr v. Immtech Intern., Inc.*, 570 F.3d 858, 866-67 (7th Cir. 2009); *Essex Real Estate Group, Ltd. v. River Works, LLC*, 2002 WL 1822913, at *7 (N.D. Ill. Aug. 7, 2002) (individual defendant broker's conduct, as employee of allegedly interfering brokerage company, was privileged from tortious interference claim due to his employment status); *3Com Corp. v. Electronics Recovery Specialists, Inc.*, 104 F. Supp. 2d 932, 938 (N.D. Ill. 2000) ("Illinois law grants a qualified privilege to corporate officers protecting them from liability for decisions made on behalf of the company."); *6030 Sheridan Rd., LLC v.*

*Wright*, 2011 WL 10068683, at * 8 (Ill.App. 1st Dist. Sept. 30, 2011) (fiduciary privilege applies equally to LLC officers due to their fiduciary duties owed to their LLCs). Here, Acoustical has not alleged that the individual Defendants were furthering any personal goals or acting contrary to Vertetek's interests. Rather, the allegations here suggest that the individual Defendants were attempting to further the interests of Vertetek. Therefore, dismissal of Counts VI and VII against Defendants Pulciani, Rucinski, and Belmonte is warranted.

### E. Tortious Interference with Contract Against the 360 Defendants

Count 5 of the complaint, Acoustical's sole claim against 360 and Rairick, is for tortious interference with contract. The elements for a tortious interference with contract claim are set forth above. Acoustical alleges, on information and belief, that 360 and Rairick became aware in early 2012 that Acoustical was Vertetek's exclusive distributor. Nevertheless, Acoustical contends that 360 and Rairick "intentionally and unjustifiably induced and caused Vertetek to breach [its February 2012 agreement with Acoustical]." The 360 Defendants move to dismiss the sole count asserted against them, claiming that Acoustical has failed to sufficiently allege the necessary elements. For the reasons set forth below, 360's arguments are unpersuasive.

First, the 360 Defendants claim that "Acoustical failed to sufficiently allege that 360 or Rairick were aware, when 360 signed its agreement with Vertetek, that Acoustical and Vertetek had entered into an exclusive distribution agreement." Contrary to Defendants' contention, in paragraph 76 of the complaint, Plaintiff Acoustical states, "[u]pon information and belief, Defendants TSC and David Rairick became aware of the Acoustical Agreement and that Acoustical had been appointed the exclusive distributor for Vertetek's Products in early 2012." Such allegations are sufficient to withstand a motion to dismiss. See *Schnusenberg v. University of Chicago*¸ 1996 WL 451313 (N.D. Ill. 1996) (holding that a party may plead an element of

16

tortious interference with contract upon information and belief and withstand a motion to dismiss under the liberal pleading standard). Other factual allegations create an inference of knowledge as well. Prior to Acoustical's dealings with 360, Acoustical alleges that it had proliferated a niche market with few players, establishing itself as the distributor for the Vertetek Products. Additionally, 360 had actual knowledge of the contract no later than June 13, 2013, when the President of 360 met with Acoustical and Vertetek in person and agreed that it was required to purchase all Vertetek Products from Acoustical, pursuant to the Acoustical Agreement. Such allegations are sufficient to withstand a motion to dismiss, and the summary judgment cases cited by the 360 Defendants do not compel a different result.

The 360 Defendants next argue that Acoustical failed to allege that "360 or Rairick intentionally induced Vertetek to breach its agreement with Acoustical." In support of their argument, Defendants state that "merely entering into an agreement with a third party with the knowledge that the third party cannot perform the present agreement and the prior agreement does not alone constitute tortious interference." See 360 Memo. at 11 (citing *Medco Research, Inc. v. Fujisawa USA, Inc.*, 1995 WL 389990 * 3 (N.D. Ill. Jan. 30, 1995)). This argument overlooks the allegations in the complaint that suggest that 360 and Vertetek were working together, misleading Acoustical as to their intentions, delaying resolution of obvious issues, and, eventually, structuring a deal to cut Acoustical out entirely. These type of allegations suffice at this stage to state a claim for interference by one or both of the corporate Defendants; again, discovery will flesh out whether Acoustical's allegations of interference are accurate, or whether 360 and Vertetek were simply entering into a new agreement with one another that did not run afoul of the Acoustical agreement.

Defendants' final argument in favor of dismissal is that Acoustical failed to allege that 360's and Rairick's interference with Acoustical's agreement was malicious; that is, intentional and unjustified. Whether a party has acted "intentionally and unjustifiably" may be inferred from the allegations. See *United Air Lines, Inc. v. ALG, Inc.*, 912 F. Supp. 353, 361 (N.D. Ill. 1995) (holding that a court may infer from a plaintiff's allegations that defendant "interfered with its contract relationship," and that defendants' actions were taken "intentionally and tortuously"; that the plaintiff had a contract with a third-party, defendant knew of this relationship, and defendant intentionally and unjustifiably caused the third-party to break its contractual relationship). Here, Plaintiff alleges that 360 executed a separate conflicting contract, with knowledge of and without regard for Acoustical's exclusive rights to distribute the Vertetek product, actively promoted and sold Vertetek products in violation of the Acoustical agreement, and employed a half-year scheme to delay during which time the 360 Defendants sold Vertetek products in direct violation of the Acoustical agreement. These allegations state a claim that 360 acted intentionally and unjustifiably when it induced Vertetek to breach its agreement with Acoustical.

However, for the same reasons set forth in dismissing Acoustical's tortious interference claims against the individual Vertetek Defendants, Rairick's actions as an officer and member of 360 are privileged from Acoustical's interference claim. Plaintiff has not pled that Rairick (or the individual Vertetek Defendants) acted contrary to their own companies' interests. Rather, the allegations suggest that the individuals Defendants' actions were designed to profit their companies. Absent allegations that Rairick's conduct was antagonistic to the interests of 360, Acoustical has not pled enough to overcome the corporate officer's privilege protecting Rairick (and, as set forth above, Pulciani, Rucinski, and Belmonte) from liability for tortious

interference. See *Gorbien v. Royal Truck & Trailer Corp.,* 1994 WL 11666, at *4 (N.D. Ill. Jan.5, 1994); see also *Fuller,* 719 F.2d at 1333; *Lippert Marketing, Ltd. v. Kingwood Ceramics, Inc.,* 1998 WL 699023, at *25–26 (N.D. Ill. Oct. 5, 1998). Count 5 is dismissed as to Defendant Rairick.[5]

## IV. Conclusion

For these reasons, the Court grants in part and denies in part the Vertetek Defendants' motion to dismiss [27] and grants in part and denies in part the 360 Defendants' motion to dismiss [29]. The Court denies the Vertetek Defendants' motion for a more definite statement [27]. Counts 6 and 7 are dismissed as to Defendants Richard Pulciani, Timm Rucinski, and Antonio Belmonte, and Count 5 is dismissed as to Defendant David Rairick. All other claims survive Defendants' motions to dismiss.

Dated: April 8, 2014

Robert M. Dow, Jr.
United States District Judge

---

[5] It would be a different story if Acoustical had alleged that the individual Defendants misappropriated their companies' profits for their own use or otherwise show that the individual Defendants were the beneficiaries of the scheme. But Acoustical has not advanced any such allegations.